UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x

1/21/15

LOCAL UNION NO. 40 of the
INT'L ASS'N OF BRIDGE, STRUCTURAL :
AND ORNAMENTAL IRON WORKERS,                    REPORT & RECOMMENDATION
et al.,                            :            12cv4854 (LTS) (MHD)

           Plaintiffs,  :

      -against-             :

CAR-WIN CONSTR., INC. and CRV      :
PRECAST CONSTR., LLC,

               :

         Defendants.
----------------------------------x

TO THE HONORABLE LAURA T. SWAIN, U.S.D.J.

On June 21, 2012, plaintiffs -- which consist of a number of

local unions and related benefit funds -- filed an action in this

court against two allegedly related construction companies, Car-Win

Construction, Inc. ("Car-Win") and CRV Precast Construction, LLC

("CRV"). Plaintiffs allege, inter alia, that defendants violated

provisions of the governing collective bargaining agreement ("CBA")

that mandate contributions to the funds, payment of certain wages,

and access to records necessary to ensure compliance with the CBA,

and that plaintiffs are owed the balance due under a judgment

entered against Car-Win in both New York and New Jersey state

courts.

1

Plaintiffs now seek a default judgment against defendants for failing to comply with discovery obligations and related orders by this court. They also seek injunctive relief in the form of an order requiring defendants to submit to an audit of their financial records from January 1, 2008 through the present. Separately, plaintiffs seek an award of fees associated with an earlier motion for a default judgment.

For the reasons that follow, we recommend that plaintiffs' motion for a default judgment be granted, that a post-default inquest be conducted, and that plaintiffs' request for an audit be granted subject to the temporal qualifications that will be described. We also recommend that plaintiffs' application for fees be granted in its entirety.

## PROCEDURAL HISTORY

### I. Plaintiffs' Complaint

We begin by detailing plaintiffs' allegations and the relief they seek. Plaintiffs include Local Union Nos. 40 and 361 of the International Association of Bridge, Structural and Ornamental Iron Workers, both of which represent "individuals who perform

2

structural iron work." (Compl. ¶¶ 4-5). Local Union No. 40 represents workers in a "geographical jurisdiction, including but not limited to the Counties of New York and the Bronx." (Id. at ¶ 4). Local Union No. 361 represents a "geographical jurisdiction, including but not limited to the County of Brooklyn." (Id. at ¶ 5). The remaining plaintiffs are benefit funds related to these two unions, which include, inter alia, a health fund, a pension fund, a vacation fund, and an annuity fund (the "Funds"). (Id. at ¶ 6).

Car-Win entered into a CBA with the unions beginning on July 1, 1996. (Compl. ¶ 10; see also Ex. 2 to Decl. of Alicia M. Shotwell dated Feb. 14, 2014 (hereinafter "4th Shotwell Decl.") [docket no. 51]). Among Car-Win's obligations under the CBA, it agreed to make various contributions to the plaintiff benefit funds. (Compl. ¶ 10). The precise terms of those arrangements are delineated in the CBA and various Agreements and Declarations of Trusts incorporated into the CBA by reference. (Compl. ¶¶ 11-12; see also Ex. 2 to 4th Shotwell Decl. at §§ 16-24 of the attached CBA).[1]

Broadly, Car-Win committed itself to contributing to these

---

[1] For clarity, further references to the CBA -- located at Ex. 2 to 4th Shotwell Decl. -- will cite only to the internal section numbers of the CMA.

3

funds based on the hours worked by its employees and hourly rates set by the CBA. (Compl. ¶ 12; see, e.g., CBA § 16(a)). Additionally, while these sections of the CBA frame the requirement of benefit contributions in terms of hours worked by union employees, the agreement elsewhere states as follows:

> The Employer agrees not to sell or assign, subcontract or sublet any work covered by this Agreement to any person, firm or corporation which is not in contractual relationship with the Union. Any Employer who violates this section shall be liable to the Joint Funds for the fringe benefit contributions due on work performed by his subcontractor.

(CBA § 39; see also Compl. ¶ 12).

As will be discussed later, see infra p. 66, defendants assert that Car-Win ceased operations in September 2009. (See, e.g., Ex. 6 at ¶ 3(1) to 4th Shotwell Decl.). Plaintiffs allege, however, that CRV is merely an alter-ego of Car-Win, that CRV and Car-Win are a single employer, and that CRV is a "disguised continuance" of Car-Win, an arrangement designed to "avoid[] [Car-Win's] contractual and Trust Fund obligations." (Compl. ¶¶ 13-17).[2] Plaintiffs ultimately assert that CRV was and is as bound by the CBA as Car-Win (id. at ¶ 17) and that Car-Win and CRV are "jointly

---

[2] Specifically, plaintiffs assert that "CARWIN and CRV share common ownership, common management, common supervision (in the person of Thomas Carroll or his family members, specifically his son, Timothy Carroll), share a common business purpose (structural steel erection/installation); they share common operations, employees, customers and equipment." (Compl. ¶ 17).

4

and severally liable for each other's debts and obligations." (See, e.g., id. at ¶ 56).

Plaintiffs go on to allege that CRV engaged in covered work in the craft and geographic jurisdiction of Local Union No. 361 and failed to comply with the requirements of the CBA. (Id. at ¶ 25). Specifically, plaintiffs allege that CRV did not pay the required wages for this work, in the sum of $263,250.00. (Id.). Plaintiffs further allege that CRV neglected to make the related contributions to the benefit funds, in the sum of $357,223.00. (Id. at ¶ 26). Plaintiffs also seek additional damages pursuant to the CBA, including interest ($28,242.00), attorneys' fees ($89,305.75), and liquidated damages ($71,44.60). (Id. at ¶ 27).[3]

With respect to Local Union No. 40, plaintiffs allege that CRV failed to pay $65,710.00 in required wages. (Id. at ¶ 31). Plaintiffs also assert that CRV neglected to make $87,722.40 in benefit contributions, and they seek additional damages for this violation as well, including interest ($8,610.91), attorneys' fees

---

[3] The damages at issue in this paragraph appear to all be connected to work performed at a jobsite located at 11 Broadway in Brooklyn, commencing on or about September 2011. (See Compl. ¶¶ 5, 18-21, 25-27). Plaintiffs allege that CRV failed to employ union members to perform certain steel-work at this site and, thereby, did not fulfill its wage and benefit-contribution obligations under the CBA. (Id. at ¶ 18-21).

($21,930.60), and liquidated damages ($17,544.48). (<u>Id.</u> at ¶¶ 32-33).[4]

Turning from CRV's violations of the CBA -- as an alleged alter-ego of Car-Win -- the complaint then delineates several allegations against Car-Win itself. (<u>See</u> <u>id.</u> at ¶¶ 34-48). First, plaintiffs explain that "[p]ursuant to the terms and conditions of the applicable C.B.A. and Trust Agreements, CARWIN, is required to provide access to the records necessary for the Trust Funds to determine whether CARWIN complied with the obligation to contribute to the Trust Funds." (<u>Id.</u> at ¶ 35; <u>see</u> <u>also</u> CBA § 24(a), (d)). According to plaintiffs, Car-Win "fail[ed] to allow Plaintiffs to schedule and complete an audit of CARWIN's books and records for the period May 24, 2010 through May 31, 2011 after demand for an audit was made upon CARWIN." (Compl. ¶ 36).

Plaintiffs thus seek access to Car-Win's financial records for this period for purposes of an audit, on the basis of which they will seek whatever benefit contributions the audit reveals to be

---

[4] These damages are asserted in section of the complaint that appears to describe work done in the jurisdiction of Local Union No. 40. (<u>See</u> Compl. ¶ 31; <u>compare</u> <u>id.</u> at ¶¶ 28-33 <u>with</u> <u>id.</u> at ¶¶ 22-27). However, plaintiffs also state that the $87,722.40 figure representing unpaid benefit contributions is "a direct and proximate result of the Defendant's breach of its contract with LOCAL UNION 361." (<u>Id.</u> at ¶ 33). Still, in context, this out-of-place reference to Local Union No. 361 seems the more likely scrivener's error.

due. (Id. at ¶ 40). Plaintiffs are also asking for a slew of related remedies, including attorney and auditor fees, court costs, interest, and liquidated damages. (Id. at ¶¶ 37-40).[5]

Finally, plaintiffs explain, based on an audit that they did perform of Car-Win's financial records, that defendant failed to make benefit contributions for the period of August 1, 2008 through July 26, 2009, in addition to related interest and liquidated damages payments. (Compl. ¶ 42). The parties eventually agreed to settle these claims on June 24, 2010 for $72,509.62, of which $36,991.49 represented the unpaid contributions. (Id. at ¶ 43). To secure plaintiffs against the possibility of Car-Win's default on this agreement, Car-Win also executed a Confession of Judgment for the full amount allegedly due, which was $118,749.41. (Id. at ¶¶ 43-44).

Plaintiffs state that Car-Win did indeed default on settlement payments, after having paid only the $36,991.49 representing the past-due contributions. (Id. at ¶ 45). Subsequently, plaintiffs

_____

[5] Plaintiffs claim an entitlement to the greater of double interest or interest plus liquidated damages. (See Compl. ¶ 39). While this is a generally correct summary of the relevant law, see 29 U.S.C. § 1132(g)(2)(B), the statute contains an important qualification, a discussion of which more appropriately belongs in the context of the inquest that we are recommending follow a decision on this motion. See infra pp. 53-56. Even then, this point is likely moot. See CBA § 24(g).

filed the Confession of Judgment in the Nassau County Supreme Court on November 10, 2011, in which a judgment was entered for $82,017.92 -- presumably, the total amount due under the Confession of Judgment, less what was paid toward the settlement amount. (Id. at ¶¶ 45-46).[6] Plaintiffs also docketed this judgment in the Superior Court of New Jersey, Bergen County on February 7, 2012. (Id. at ¶ 47). They now seek the amount due under this judgment, "together with additional contractual damages pursuant to the C.B.A." (Id. at ¶ 48).[7]

## II. Early Procedural History

We have recounted a portion of the protracted procedural history of this case before. (See Order dated Jan. 2, 2014 [docket no. 42] pp. 2-6). We reiterate much of that history again here -- elaborating on it in some detail -- both because of what has transpired since we last visited the possibility of a default

---

[6] These numbers do not perfectly align: The precise sum that results from subtracting the amount paid under the settlement from the amount contained in the Confession of Judgment is $81,757.92, not $82,017.92. In any case, this relatively small discrepancy is irrelevant at this stage. We are recommending granting default, with inquest to follow, for which plaintiffs will need to supply detailed affidavits and evidence precisely describing what they are owed and why. See infra pp. 53-57.

[7] As will also be discussed, see infra pp. 60-64, in post-complaint submissions plaintiffs have identified additional damages they believe they are owed, for example, on projects that CRV has engaged in since the commencement of this lawsuit. (See, e.g., Pls.' Mem. 15-16).

8

judgment and because of the particular importance of detailing such
history in motions of this sort.

Plaintiffs filed their complaint against Car-Win and CRV on
June 21, 2012. (Docket no. 1). On June 27, 2012, plaintiffs served
defendants' current attorney, Mr. George Christopoulos, with a copy
of the summons and complaint. (Decl. of Alicia M. Shotwell dated
Apr. 29, 2013 (hereinafter "1st Shotwell Decl.") [docket no. 28] at
¶ 6 & Ex. C). Through the New York Secretary of State, Car-Win
itself was served on August 13, 2012 (see docket no. 8) and filed
its answer on September 4, 2012. (Docket no. 9).[8]

CRV -- through Frank Valentino, a designated recipient -- was
served on July 2, 2012. (Docket no. 5; see also 1st Shotwell Decl.
at ¶ 7 & Ex. F). Shortly before then, the District Court had
scheduled an initial conference for September 28, 2012. (See Order
dated June 28, 2012 [docket no. 2]). This order required that a

---

[8] The record also contains somewhat muddled references to a series of
stipulations entered into by plaintiffs and Car-Win extending Car-Win's time
to answer. Prior to being served through the Secretary of State, Car-Win had
already appeared via a joint stipulation in which it was given through August
16, 2012 to answer. (See Endorsed stipulation dated July 30, 2012 [docket no.
3] & 1st Shotwell Decl. at ¶ 6). In her 2013 declaration, counsel for
plaintiffs mentioned the existence of a second stipulation -- neither attached
to that declaration as an exhibit nor reflected in the docket sheet -- which
apparently further extended the time for Car-Win to answer through August 30,
2012. (1st Shotwell Decl. at ¶ 6). In any event, likely because Car-Win's
answer was timely filed based on the August 13 service through the Secretary
of State, plaintiffs appear to take no issue with the fact that the answer was
not filed within either of the deadlines set by these two stipulations.

9

joint "Preliminary Pre-Trial Statement" be filed by no later than seven days before the initial conference. (Id.).

On September 25, 2012, plaintiffs' counsel wrote to the District Court -- with the consent of Mr. Christopoulos (at the time, seemingly only representing Car-Win) -- asking for an adjournment of this conference "as we attempt to obtain the information necessary to prepare the pre-trial statement." (Letter dated Sept. 24, 2012 [docket no. 10]). This letter did not describe the reasons for the delay, although a later declaration explained that "[b]oth Plaintiffs and DEFENDANTS were [initially] unaware of [the] requirement" of the pre-trial statement. (1st Shotwell Decl. at ¶ 8). However, the letter did note that, in attempts to obtain the consent of CRV to the requested adjournment, counsel had reached out to Mr. Valentino, "who informed us that he was unfamiliar with the lawsuit...[even though] our Affidavit of Service [see docket no. 5] indicates that Mr. Valentino was served with our papers on July 2, 2012." (Letter dated Sept. 24, 2012).

The initial conference was thus adjourned to October 26, 2012. (Id.). By letter dated October 18, 2012, however, Mr. Christopoulos (now nominally representing both Car-Win and CRV) asked for another adjournment, with plaintiffs' consent. (Letter dated October 18,

10

2012 [docket no. 11]). While plaintiffs had prepared their portion of the pre-trial statement, Mr. Christopoulos "require[d] additional time to gather the information necessary to prepare the pre-trial statement." (Id.). The District Court thus rescheduled the initial conference to December 7, 2012. (Id.).

The pre-trial statement was eventually filed on December 3, 2012. (See docket no. 12). In that document, Mr. Christopoulos pointed out that -- while he was attorney of record for Car-Win and had advised plaintiffs that he would be representing CRV as well -- he had not yet submitted an answer on behalf of CRV and "[a]s a result, the details of CRV's involvement in this action were not discussed at the time the Parties met and conferred to prepare this Statement." (Id. at p. 1 n.1).

Having held the initial conference on December 7, 2012 -- by which time CRV had still not responded to the complaint -- the District Court ordered that defendant do so by December 21, 2012. (See Pre-trial scheduling order dated [docket no. 14] at ¶ 12).⁹ This date came and went, but CRV did not file its answer (dated January 21, 2013) until January 25, 2013. (Docket no. 17).

---

⁹ The District Court also set June 28, 2013 as the end of fact discovery and August 30, 2013 for the end of expert discovery. (Pre-trial scheduling order at ¶ 2).

11

Additionally, in the District Court's December 7, 2012 scheduling order, all parties were instructed to serve their Rule 26(a)(1) disclosures by December 21, 2012. (Pre-trial scheduling order at ¶ 12). While plaintiffs served their initial disclosures by this date, neither Car-Win nor CRV did so -- nor did defendants produce <u>anything</u> in the several months thereafter, as we are about to describe. (<u>See</u> 1st Shotwell Decl. at ¶¶ 12-13).

On February 20, 2013, plaintiffs served document requests on both defendants. (1st Shotwell Decl. at ¶ 17 & Ex. R). As defendants did not respond to these requests within the required thirty days, plaintiffs sent a letter to defendants' counsel insisting on responses by March 28, 2013. (1st Shotwell Decl. at ¶ 17 & Ex. U).[10]

---

[10] This date was chosen because March 28, 2013 was the date on which we were scheduled to hold a settlement conference with the parties. (<u>See</u> docket no. 18). This conference was itself the result of an adjournment of a settlement conference originally scheduled for February 28, 2013 (<u>see</u> docket nos. 16, 18) and adjourned at the request of defendants' counsel. (<u>See</u> 1st Shotwell Decl. at ¶ 16 & Ex. S). On March 27, 2013, we were again asked by defendants' counsel to reschedule the settlement conference. (<u>See</u> 1st Shotwell Decl. at ¶ 17 & Ex. V). Counsel provided other excuses for seeking this adjournment (<u>see</u> Ex. V to Shotwell Decl. A), but we find it difficult not to connect the dots -- as plaintiffs have done (<u>see</u> 1st Shotwell Decl. at ¶ 17) -- between this request and the fact that, even by the March 28, 2013 date, defendants had not provided any discovery. (<u>Id.</u>). We rescheduled the settlement conference for April 19, 2013 (docket no. 19) and rescheduled it again for May 2, 2013 (docket no. 22), after it was apparent that defendants had <u>still</u> not produced a single piece of paper. (Apr. 17, 2013 Tr. [docket no. 61] 4). Ultimately, we adjourned the conference <u>sine die</u>, in view of the incompleteness of defendants' production and the then-pending first motion for a default judgment. (<u>See</u> Endorsed letter dated May 1, 2013 [docket no. 29]).

By letter dated March 28, 2013, plaintiffs sought a pre-motion discovery conference, which we scheduled for April 17, 2013. (See Ex. X to 1st Shotwell Decl.; Order dated April 1, 2013 [docket no. 20]).

### III. First Motion for a Default Judgment

At the April 17, 2013 conference, plaintiffs' counsel summarized the state of the case: Aside from the two answers and the various adjournment requests, she had received nothing from defendants. (Apr. 17, 2013 Tr. 2). They had neither responded nor objected to plaintiffs' discovery requests, and they had not propounded any discovery requests of their own. (Id.).

We then turned to defendants' counsel and asked, "Your client is ready to default in this case? You're on the edge of a default." (Id.). Counsel responded as follows: "I advised them this morning, Judge, as I was on my way to see you, I told them it probably won't be a very pleasant experience. I have advised them that they have had the discovery demand for a period of time." (Id.).

We then directed defendants to provide full and complete discovery responses to all requests by April 24, 2013 and

explicitly warned counsel that failure to do so would likely result in a motion for default. (Id. at 3). We also advised defendants' counsel that "for the sake of giving your clients a real taste of reality," he should acquire a copy of the conference transcript and show it to his clients -- a suggestion with which counsel agreed. (Id. at 4-5).

On April 24, 2013, defendants predictably asked for two more weeks to produce documents, an application that we denied in an endorsed order that gave them two more days to comply. (See Endorsed letter dated Apr. 24, 2013 [docket no. 23]). This order, too, was violated (see 1st Shotwell Decl. at ¶ 20), and plaintiffs therefore filed their motion for sanctions on or about April 29, 2013, seeking entry of a default against both defendants. (See docket nos. 26-28). We then set May 10, 2013 as the date by which defendants were to respond to this motion. (Endorsed order dated May 1, 2013 [docket no. 29]).

Defendants did indeed respond to the motion on May 10. (Docket nos. 32-33). This also happened to be the date on which defendants began delivering discovery responses to plaintiffs. (See Decl. of Alicia M. Shotwell dated May 15, 2013 (hereinafter "2d Shotwell Decl.") [docket no. 35] at ¶ 4 & Ex. C). Defendants claimed that

14

their delivery of such documents on the day their response to the motion was due was the coincidental result of the logistics of production, copying, and mailing. (See Decl. of George Christopoulos dated May 10, 2013 [docket no. 32] at ¶¶ 3-5). Still, we noted in a subsequent order -- and we reiterate here -- that this production was "[i]n obvious response to the threat of sanctions." (See Order dated Jan. 2, 2014 p. 4).

Ultimately, by May 16, 2013 or thereabout, defendants had provided plaintiffs with fifteen boxes of documents -- much of it apparently irrelevant -- not labeled, indexed, or organized in any discernable order. (See Decl. of Alicia M. Shotwell dated June 25, 2013 (hereinafter "3d Shotwell Decl.") [docket no. 38] at ¶¶ 6, 16). In light of this vast and bewildering production, plaintiffs wrote to the court requesting that we hold our decision on their motion in abeyance, pending the results of an in-person meeting with defendants' counsel that was intended to assist in sorting out the nature of the provided material. (See Endorsed letter dated May 28, 2013 [docket no. 36]).

The parties' counsel apparently met at least three times over subsequent days (3d Shotwell Decl. at ¶ 7), yet were unable to come to an agreement about the sufficiency of defendants' production.

15

(<u>See</u> Endorsed letter dated June 18, 2013 [docket no. 37]). We therefore authorized plaintiffs to supplement their motion with an explanation of the remaining outstanding deficiencies in defendants' production. (<u>Id.</u>).

The supplementary papers submitted after that order included lists of essential corporate and financial documents still sought by plaintiffs from both defendants, as well as responsive lists by defendants of items either produced or unable to be produced. (<u>See</u>, e.g., Decl. of George Christopoulos dated July 2, 2013 [docket no. 39] at ¶ 3 & Ex. A). Fundamentally, what remained was a familiar type of discovery dispute: Plaintiffs sought certain items and defendants generally asserted that they had provided whatever they had, explaining that the unproduced items were either non-existent or not locatable. (<u>Id.</u>).

With plaintiffs still seeking a default judgment, we then employed an equally familiar solution, finding the harsh remedy of a default judgment to be premature. (<u>See</u> Order dated Jan. 2, 2014 pp. 10-12). By order dated January 2, 2014, we instructed both defendants

> to provide to plaintiffs' counsel, within one week from
> the issuance of this memorandum and order, an affidavit
> or a declaration under penalty of perjury by individuals

16

> with personal knowledge specifying in detail (1) the
> document retention and storage policies...pertaining to
> the categories of documents that [they] claim[] to be
> unable to locate and (2) specifying the nature and extent
> of the search that this defendant made for the categories
> of documents that it claims to be unable to find.

(Id. at p. 10; see also id. at p. 11). We further directed that,

within one week of the receipt of those affidavits or declarations,

plaintiffs were authorized to depose "any affiants or declarants

concerning document retention and storage and the searches made for

those documents." (Id. at 10-11).


We also ruled that plaintiffs were entitled to reimbursement

for "the reasonable expense of their motion practice" and allowed

them to serve and file an affidavit or declaration, with

contemporaneous time records, within two weeks. (Id. at 12).

Defendants were to respond within one week thereafter. (Id. at

13).[11]


## IV. Second Motion for Default Judgment


On January 10, 2014, plaintiffs alerted us to defendants' non-

compliance with our January 2 order and requested a conference on

the matter. (Letter dated Jan. 10, 2014 [docket no. 43]). We then

_____

[11] See infra pp. 69-73.

met with the parties at an in-person conference on January 31, 2014. (See Jan. 31, 2014 Tr. [docket no. 63]). Even by that date, defendants had still not sent to plaintiffs the required affidavits or declarations. (Id. at 2, 5).[12]

At that point, we advised plaintiffs that, in light of defendants "endless default in this case," they were authorized to file another "default motion or other sanctions motion." (Id. at 5). We set a briefing schedule and informed defendants that "unless something has dramatically changed by then the hammer will fall." (Id.). Accordingly, plaintiffs filed their motion for sanctions on February 14, 2014, and defendants filed their opposition on February 21, 2014. (See docket nos. 49-53).

## PLAINTIFFS' MOTION

Plaintiffs seek a default judgment against defendants under Rule 37(b)(2)(A)(vi) of the Federal Rules of Civil Procedure. (See Pls.' Mem. 5 [docket no. 50]). Plaintiffs frame their arguments around an oft-cited set of relevant factors, see, e.g., World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp., 694 F.3d 155,

---

[12] Nor, we were told, had defendants supplied any additional discovery. (See Jan. 31, 2014 Tr. 2).

159 (2d Cir. 2012), contending (1) that defendants' non-compliance with discovery has been willful (Pls.' Mem. 7-9), (2) that lesser sanctions will be ineffective (id. at 9-10), (3) that the length of non-compliance militates in favor of default (id. at 10-11), (4) that defendants' had been duly warned of the potential consequences of continued non-compliance (id. at 11-12), and (5) that defendants' repeated discovery failures have prejudiced plaintiffs. (Id. at 12-14).

Apart from an entry of a default, plaintiffs seek equitable relief in the form of an order requiring defendants to submit to an audit of their financial records. (Id. at 14-16).

## DEFENDANTS' OPPOSITION

Defendants' opposition is less cleanly structured and somewhat difficult to follow. However, as we will detail below, they are generally asserting (1) that the above-stated factors are not met in this case, (2) that plaintiffs are, in any event, specifically at fault with respect to the current dispute, (3) that plaintiffs' own conduct during the course of discovery has been so deficient as to excuse defendants' own failures, and (4) that, even if imperfectly, defendants have partially fulfilled their obligations

under our last order and that default is therefore too harsh a sanction here. (See Opp. Mem. 1-4).

Finally, defendants counter plaintiffs' request for equitable relief by suggesting that this application is not permissible under either relevant case-law or our instructions to the parties. (Id. at 4-5).

**ANALYSIS**

I. Motion for Default Judgment Under Rule 37(b)

A. Relevant Legal Framework

Plaintiffs seek a default judgment under Rule 37. (See Pls.' Mem. 5). In pertinent part, Rule 37(b) states that if a party "fails to obey an order to provide or permit discovery," the court may "render[] a default judgment against the disobedient party." Fed. R. Civ. P. 37(b)(2)(A). As emphasized by the Second Circuit, "[i]mposing sanctions pursuant to Rule 37 is within the discretion of the district court and a decision to dismiss an action [or enter a default] for failure to comply with discovery orders will only be reversed if the decision constitutes an abuse of that discretion."

20

World Wide, 694 F.3d at 159 (quoting John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc., 845 F.2d 1172, 1176 (2d Cir. 1988)).

It is well established that, when exercising discretion pursuant to Rule 37, our court is guided by the following factors: "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of...noncompliance." World Wide, 694 F.3d at 159 (quoting Agiwal v. Mid Island Mortg. Corp., 555 F.3d 298, 302 (2d Cir. 2009)); see also Guggenheim Capital, LLC v. Birnbaum, 722 F.3d 444, 451 (2d Cir. 2013); Ruiz v. Citibank, N.A., 2014 WL 4635575, *2 (S.D.N.Y. Aug. 19, 2014). While these four factors are often the only ones specifically listed in the context of discovery sanctions motions, "[b]ecause the text of the rule requires only that the district court's orders be 'just,' however, and because the district court has 'wide discretion in imposing sanctions under Rule 37,' these factors are not exclusive." World Wide, 694 F.3d at 159 (quoting S. New England Tel. Co. v. Global NAPs Realty, Inc., 624 F.3d 123, 144 (2d Cir. 2010)).

21

Given that discretion, judges in this district often allude also to the prejudice suffered by the movant when assessing the propriety of a sanctions motion. See, e.g., S. New England, 624 F.3d at 148-49 (citing cases), Briese Lichttechnik Vertriebs GmbH v. Langton, 2011 WL 280815, *8 (S.D.N.Y. Jan. 10, 2011), Martinez v. E&C Painting, Inc., 2008 WL 482869, *4 (S.D.N.Y. Feb. 21, 2008). Although real prejudice to a litigant may serve as a compelling consideration in support of dispositive relief, the Second Circuit has recently emphasized that a lack of prejudice should not be given significant weight in the overall analysis. See S. New England, 624 F.3d at 148-49 ("[W]e, along with the Supreme Court, have consistently rejected the 'no harm, no foul' standard for evaluating discovery sanctions...Although one purpose of Rule 37 sanctions may in some cases be to protect other parties to the litigation from prejudice resulting from a party's noncompliance with discovery obligations, Rule 37 sanctions serve other functions unrelated to the prejudice suffered by individual litigants.") (citations omitted) (emphasis in original).

We are mindful that sanctions "akin to dismissing the action altogether" -- sanctions such as the imposition of a default judgment -- are "drastic remed[ies]." World Wide, 694 F.3d at 159. However, "discovery orders are meant to be followed." S. New

England, 624 F.3d at 144 (quoting Bambu Sales, Inc. v. Ozak Trading Inc., 58 F.3d 849, 853 (2d Cir. 1995)). Therefore, "judgment against a defendant...may be appropriate in extreme situations, as when a court finds willfulness, bad faith, or any fault on the part of the noncompliant party." Guggenheim, 722 F.3d at 451 (internal quotations omitted).

Indeed, we have noted in the past -- importantly, including explicitly in our January 2, 2014 order on plaintiffs' last motion for a default judgment -- that "dispositive measures are certainly in the court's arsenal, if needed, to remedy otherwise irremediable prejudice or to address persistent bad-faith pre-trial conduct by a litigant." Local Union 40 of the Int'l Ass'n of Bridge, Structural and Ornamental Iron Workers v. Car-Win Constr., Inc., 2014 WL 61443, *3 (S.D.N.Y. Jan. 2, 2014) (quoting Briese Lichttechnik, 2011 WL 280815, at *8 (citing cases)).

Below, we consider each aspect of this analysis in turn.

23

B. Application of the Relevant Framework to the Current Motion

i. Willfulness and the Reason(s) for Non-Compliance

We begin our examination of the relevant factors with "the willfulness of the non-compliant party or the reason for noncompliance." World Wide, 694 F.3d at 159 (quoting Agiwal, 555 F.3d at 302). We conclude that defendants have indeed engaged in extended willful violation of their discovery obligations and court orders.

In our January 2, 2014 order, we clearly stated that defendants were to provide plaintiffs with affidavits or declarations explaining their document-retention policies and the nature and extent of their search for the documents they assertedly could not produce. (Order dated Jan. 2, 2014 pp. 10-12). This requirement was, itself, a last-ditch attempt at saving defendants from dispositive discovery sanctions. (Id.). Defendants flouted the deadline set by our order and had no explanations for their non-compliance at the January 31, 2014 conference. (See Jan. 31, 2014 Tr. 3-5).

At that conference, we squarely addressed this failure with

24

defendants' counsel: "So your clients have failed to comply with our most recent discovery order, correct? It is a simple yes or no." (Id. at 5). While counsel declined to give this 'yes or no' answer, he did say this: "I can't answer that question, your Honor. I have advised them what needs to be provided, Judge. It hasn't been given to me. That's all I can tell you." (Id.).

In defendants' memorandum in opposition to plaintiffs' motion, they argue that they "have not willfully disregarded the Court's Orders" -- but they completely ignore the very order that brought us to this point. (See Opp. Mem. 2-3). Instead, defendants point out that "they have submitted an answer, initial disclosures and discovery responses." (Id. at 3). Putting aside the fact that -- perhaps with the exception of Car-Win's answer -- defendants repeatedly ignored deadlines set with respect to these submissions (see supra pp. 8-18), they seem to be attempting to distract us from the immediate issue at hand: their failure to serve the required affidavits or declarations, which, themselves, were designed as remedies for their earlier alleged failures. (See supra pp. 16-17).

Defendants have not, however, entirely forgotten their obligations under our January 2, 2014 order and statements at the

25

January 31, 2014 hearing. Buried within defendants' counsel's declaration in opposition is a clear reference to these affidavits. (Opp. Decl. [docket no. 52] at ¶ 5). There, counsel devises a new justification for defendants' delinquency: "As to the affidavits, those can most certainly be provided however; I would prefer that Your Honor respectfully not have the Defendants' execute affidavits as they will be deposed wherein plaintiffs' counsel is free to inquire as to document retention and the Defendants' storage policies." (Id.).

In other words, we gave an order and defendants had the ability to comply, but they purposefully chose not to do so for reasons all their own and without first asking permission from this court. Without our resorting to the dictionary, this seems as good a definition of 'willful' as any.

We also note that the insidiously mundane reason provided for defendants' non-compliance does not render their behavior excusable. Defendants "forget[] that sanctions must be weighed in light of the full record in the case." Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp., 602 F.2d 1062, 1068 (2d Cir. 1979) (citing Nat'l Hockey League v. Metrop. Hockey Club, Inc., 427 U.S. 639, 642 (1979); see also In re Tartaglione, 2008 WL

336844, *3 (S.D.N.Y. Feb. 5, 2008)). Taken out of context, perhaps, any individual incident of discovery misconduct may appear forgivable -- especially when framed by some post-hoc excuse that rings of reasonableness. However,

> [i]f parties are allowed to flout their obligations, choosing to wait to make a response until a trial court has lost patience with them, the effect will be to embroil trial judges in day-to-day supervision of discovery, a result directly contrary to the overall scheme of the federal discovery rules...Any other conclusion would encourage dilatory tactics, and compliance with discovery orders would come only when the backs of counsel and the litigants were against the wall.

S. New England, 624 F.3d at 149 (quoting Cine Forty-Second St., 602 F.2d at 1068).

### ii. The Efficacy of Lesser Sanctions

Next, we must consider "the efficacy of lesser sanctions." World Wide, 694 F.3d at 159 (quoting Agiwal, 555 F.3d at 302). To this end, plaintiffs remind us (see Pls.' Mem. 9) of the purposes of Rule 37 sanctions, such as "to 'ensure that a party will not benefit from its own failure to comply,' to 'obtain compliance with a particular order issued,' and to 'serve a general deterrent effect on the case at hand and on other litigation, provided that the party against whom they are imposed was in some sense at fault.'" Szafrankowska v. AHRC Home Care Servs., Inc., 2008 WL

27

186206, *1 (S.D.N.Y. Jan. 22, 2008) (quoting <u>Update Art, Inc. v.</u> <u>Modiin Pub., Ltd.</u>, 843 F.2d 67, 71 (2d Cir. 1988)); <u>see</u> <u>also</u> <u>S. New</u> <u>England</u>, 624 F.3d at 149.

There is no indication that <u>any</u> of the above-stated purposes of Rule 37 would be effectuated by the employment of lesser sanctions at this point. We have been here before. Indeed, "this motion seems like deja vu all over again." <u>In re New York Int'l</u> <u>Hotel, Inc.</u>, 1997 WL 633522, *2 (S.D.N.Y. Oct. 14, 1997) (citing Yogi Berra). In response to plaintiffs' last motion for a default judgment -- explicitly acknowledging "the availability of alternative remedies short of default" -- we denied the request for default and provided an avenue by which defendants were given the chance to explain away their alleged non-compliance via affidavits or declarations. (Order dated Jan. 2, 2014 p. 11).[13]

With that order now violated, we are particularly concerned with the third above-quoted purpose of Rule 37, which we will restate here in the words of the Supreme Court:

> [T]he most severe in the spectrum of sanctions provided
> by statute or rule must be available to the district
> court in appropriate cases, not merely to penalize those
> whose conduct may be deemed to warrant such a sanction,

---

[13] We also awarded plaintiffs reasonable fees associated with the earlier round of motion practice. <u>See</u> <u>infra</u> pp. 69-73.

> but to deter those who might be tempted to such conduct
> in the absence of such a deterrent.

Nat'l Hockey League, 427 U.S. at 643.[14] Especially in light of

repeated warnings to defendants -- an aspect of this analysis that

we will discuss in more detail below, see infra pp. 32-35 -- at a

certain point, if a court does not eventually follow through on its

warnings, it risks undermining its ability to control current and

future would-be wayward litigants. See Agiwal, 555 F.3d at 303

("Even when the Magistrate Judge imposed a lesser sanction, [the

non-compliant party] still failed to comply."). "[U]nless Rule 37

is perceived as a credible deterrent rather than a 'paper tiger,'

the pretrial quagmire threatens to engulf the entire litigative

process." Cine Forty-Second St., 602 F.2d at 1064; see also Update

Art, Inc., 843 F.2d at 71; In re Fosamax Prods. Liab. Litig., 2010

WL 742603, *2 (S.D.N.Y. March 2, 2010).

---

[14] Over twenty years ago, Judge Easterbook noted the following about
this Supreme Court case:

> National Hockey League told appellate judges to respect the district
> judge's choice of sanction. And district judges have become more
> aggressive in using their ultimate weapon to promote the efficient
> conduct of litigation. More power to them. Drawn-out litigation
> frustrates rather than promotes justice. Judges stretched thin by
> the flux of suits must do more with fewer hours per case. That means
> more reliance on the timetables and other rules that apply across
> the board, and less custom tailoring. [The non-compliant party]
> ignored these timetables, ignores them even after the judge
> announced a last-chance two week extension. He now pays the price.

Metro. Life Ins. Co. v. Estate of Cammon, 929 F.2d 1220, 1224 (7th Cir. 1991)
(citation omitted).

### iii. The Duration of Non-Compliance

The third of the relevant factors is "the duration of the period of noncompliance." World Wide, 694 F.3d at 159 (quoting Agiwal, 555 F.3d at 302). On this front, durations of time as brief as a few months have been held to weigh in favor of dispositive sanctions. See, e.g., Embuscado v. DC Comics, 347 F. App'x 700, 701 (2d Cir. 2009) (three months); Georgiadis v. First Boston Corp., 157 F.R.D. 24, 25 (S.D.N.Y. 1996) (four months). And periods of six months or more weigh even more heavily toward such remedies. See, e.g., Agiwal, 555 F.3d at 303 (six months); Phelan v. Cambell, 507 F. App'x 14, 16 (2d Cir. 2013) (seven months); Ruzsa v. Rubenstein & Sendy Attorneys at Law, 520 F.3d 176, 177 (2d Cir. 2008) (seven months); Battiste-Downie v. Covenant House, 471 F. App'x 78, 79 (2d Cir. 2012) (one year); see also Lyell Theatre Corp. v. Loews Corp., 682 F.2d 37, 42-43 (2d Cir. 1982) ("[A] pattern of dilatory tactics...consist[ing], for example, of groundless motions, repeated requests for continuances or persistent late filings of court ordered papers...may warrant dismissal after merely a matter of months.").

Here, initial disclosures were due by December 21, 2012 (see Pre-trial scheduling order at ¶ 12) and responses to plaintiffs'

30

document requests were originally due on or about March 20, 2013. (See 1st Shotwell Decl. at ¶ 17 & Exs. R, U). Defendants served no discovery until the week of May 10, 2013 (see 3d Shotwell Decl. at ¶¶ 6, 16), and only after repeated cancellations of settlement conferences (see supra p. 12 n.10), follow-up letters sent by plaintiffs (see, e.g., Exs. U & X to 1st Shotwell Decl.), the April 17, 2013 conference, additional orders compelling compliance (each of which was violated) (see Apr. 17, 2013 Tr. 3; Endorsed order dated Apr. 24, 2013), and plaintiffs' first motion for sanctions.

According to plaintiffs, even defendants' May 2013 production was grossly inadequate. (See Endorsed letter dated June 18, 2013). However, in light of defendants' claims that some or all of the still-unproduced discovery was either non-existent or somehow lost (see Christopoulos Decl. Dated July 2, 2013 at ¶ 3 & Ex. A), we denied plaintiffs' motion for a default judgment and instead set about defining a non-sanction remedy in the form of the required affidavits or declarations. (Order dated Jan. 2, 2014). Unsurprisingly, these documents never came, nor did defendants' counsel ask us for an extension of the deadline imposed for their delivery, even when we held a conference on the issue weeks after the original deadline had passed. (See Jan. 31, 2014 Tr.).

31

Plaintiffs' second motion for a default judgment was filed on February 14, 2014 -- well over a year after the initial discovery deadline of December 2012. Defendants have dragged plaintiffs and this court through "a pattern of 'prolonged and vexations obstruction of discovery.'" S. New England, 624 F.3d at 148 (quoting Penthouse Int'l, Ltd. v. Playboy Enters., Inc., 663 F.2d 371, 388 (2d Cir. 1981)). The case law fully supports viewing this history as one that weighs strongly in favor of dispositive sanctions.

### iv. History of Warnings

The next evaluative factor is "whether the non-compliant party had been warned of the consequences of...noncompliance." World Wide, 694 F.3d at 159 (quoting Agiwal, 555 F.3d at 302). "Although parties have 'no absolute entitlement to be warned that they disobey court orders at their peril," Silva v. Confresi, 2014 3809095, *4 (S.D.N.Y. Aug. 1, 2014) (quoting Daval Steel Prods. v. M/V Fakredine, 951 F.2d 1357, 1366 (2d Cir. 1991)), this factor has been identified as the "[m]ost critical[]" of those listed in Agiwal and World Wide. See, e.g., Ruiz, 2014 WL 4635575, at *3 (quoting World Wide, 694 F.3d at 160).

Indeed, the Second Circuit "has repeatedly upheld dismissal as an appropriate sanction where the non-compliant parties were warned of the possibility." Ruiz, 2014 WL 4635575, at *3 (citing cases). Therefore, even a default judgment is appropriate where a party "has engaged in 'sustained and willful intransigence in the face of...explicit warnings from the court.'" Urbont v. Sony Music Entm't, 2014 WL 6433347, *4 (S.D.N.Y. Nov. 6, 2014) (quoting Valentine v. Museum of Modern Art, 29 F.3d 47, 50 (2d Cir. 1994)); see also Obot v. C.I.R., 254 F. App'x 57, 58 (2d Cir. 2007) (quoting LeSane v. Hall's Sec. Analyst, Inc., 239 F.3d 206, 210 (2d Cir. 2001)) ("[I]t is difficult to imagine how a dismissal [for failure to prosecute] following an unheeded warning could be an abuse of discretion.").

In our case, defendants "cannot credibly argue that [they were] not sufficiently warned that serious sanctions were imminent." Guggenheim, 722 F.3d at 453. As early as the April 17, 2013 conference, we warned defendants' counsel that his clients were "on the edge of default." (Apr. 17, 2013 Tr. 2). We also then warned counsel of the possibility of a motion for default (see id. at 3), which came about on April 29, 2013. (Docket nos. 26-28).

In our January 2, 2014 order, we determined that "a

dispositive sanction is not required at this stage." (Order dated Jan. 2, 2014 p. 11). Still, we observed that "the production efforts of both defendants [had] been woefully untimely and seemingly incomplete to some degree." (Id. at 12). We therefore felt it necessary to order defendants' preparation of affidavits or declarations to explain defendants' evident shortcomings in discovery. (Id. at 10-12). These were due within one week of the issuance of our order, yet, by January 31, 2014, they still had not been supplied. (See Jan. 31, 2014 Tr. 5).

At the January 31, 2014 conference, in light of defendants' continued delinquency -- "endless default," as we put it then -- we explained to counsel that "[i]t may be time for a default motion or other sanctions motion." (Id.). We set a briefing schedule for the motion and expressed that "unless something has dramatically changed by then the hammer will fall." (Id.). And we pressed counsel to communicate our message to his clients. (Id.).

On multiple occasions, we have warned defendants of the consequences of their continued non-compliance. Plaintiffs' two motions for default also unequivocally placed defendants on notice that they were being targeted for default. Accord Coach, Inc. v. O'Brien, 2012 WL 1255276, *9 (S.D.N.Y. Apr. 13, 2012) ("Moreover,

34

given [plaintiff's] Motion for Default Judgment, [defendant] has been on notice for months of [plaintiff's] intention to proceed with this matter to default proceedings should she fail to engage in the litigation."). Plaintiffs assert that, "[g]iven the totality of the circumstances, there can be no doubt that the DEFENDANTS were fully aware that a default judgment could, and in all likelihood, *would* be imposed against the DEFENDANTS." (Pls.' Mem. 12). We agree.

### v. Prejudice

We now turn to "the extent of the prejudice visited on the discovering party by its adversary." Local Union 40, 2014 WL 61443, at *3; see also S. New England, 624 F.3d at 148-49 (citing cases), Briese Lichttechnik, 2011 WL 280815, at * 8, Martinez, 2008 WL 482869, at *4. Here, a probing analysis of the underlying, unproduced discovery is not itself necessary to find prejudice. In various contexts, courts regularly equate prejudice and undue delay. See, e.g., Alaimo v. Automotive Consulting, 2010 WL 2884711, *1 (S.D.N.Y. July 20, 2010) ("prejudice [] always attends delay"); Robertson v. Doe, 2008 WL 2519894, *7 (S.D.N.Y. June 19, 2008) ("When a defendant hinders the discovery of relevant information, the plaintiff suffers prejudice as a result of an involuntary delay

35

in prosecuting its action."); see also Harris v. Scadiero, 94 F. App'x 860, 861 (2d Cir. 2004) ("A presumption of prejudice is appropriate where the plaintiff's delay was prolonged."); LeSane, 239 F.3d at 210. And we have already recounted the length and nature of the delays inflicted upon plaintiffs by defendants in this case. See supra pp. 30-32.

Still, the prejudice at play here goes well beyond mere delay. According to plaintiffs, the documents that have not been provided with respect to Car-Win are as follows:

(1) invoices from twenty [20] different projects where CAR-WIN performed iron work within the UNIONS' work jurisdiction; (2) payroll records from 2008 to 2012; (3) 2009 Quarter 2 tax records; (4) 2010 Quarter 4 payroll tax returns; (5) banking documents and account information from 2008 to present; (6) CAR-WIN's articles of incorporation, bylaws, shareholder meeting minutes and share ownership reports; (7) W-2 Forms for 2009, 2011 and 2012; (8) CAR-WIN's balance sheet [f]or 2008 to present; (9) CAR-WIN's general ledger for FY 2010 to FY 2013; (10) profit and loss statements for 2010 to 2012; (11) Field time sheets designating project/job location; (12) CAR-WIN advertisements or bids; and (13) Agreements with service providers from 2008 to the present.

(Id. at ¶ 17). Similarly, the documents that have not been provided with respect to CRV are as follows:

(1) 2008 balance sheet; (2) 2008 to 2009 profit and loss statement; (3) tax records for 2008, 2011 and 2012; (4) Capital One bank account records; (5) a signed and executed Operating Agreement; (6) certified payrolls for every prevailing wage project performed within the UNIONS' work jurisdiction from 2008 to the present; (7) filed time sheets showing job locations, cash journals (including its cash

36

receipt journals, cash disbursement journals, sale journals and petty cash journals), its job cost records showing accumulated labor costs and billings, job billing invoices and requisitions, and its job folders and work reported from 2008 to the present; (8) W-2 Forms from 2008 to the present; (9) documents reflecting the performance of iron work CRV subcontracted to another company in the UNIONS' work jurisdiction from 2008 to the present; and (10) Agreements between CRV and its service providers from 2008 to the present.

(Id. at ¶ 19).[15]

In the motion papers before us, plaintiffs explain precisely how the insufficiency of this document production hinders their ability to prosecute their case:

> The majority of the documents that have not been produced
> by the DEFENDANTS are material and necessary to proving

---

[15] These same lists are repeated throughout the record before us, having been served on defendants on several prior occasions. (See, e.g., Ex. 5 to 4th Shotwell Decl.). In July 2013, defendants responded, line-by-line, to these requests (the lists at issue in these earlier letters are identical in substance, but somewhat different in structure, from the above). (See Ex. 6 to 4th Shotwell Decl. (referenced in Decl. of George Christopoulos dated Feb. 21, 2014 at ¶ 3)).

We note that the July 2013 letter reveals that -- in addition to defendants' assertion that much of the requested discovery does not exist or cannot be found -- defendants (at least at this earlier stage) insisted that plaintiffs already possessed some of these documents. (See, e.g., Ex. 6 to 4th Shotwell Decl. at ¶¶ 3(a), 3(b), 3(e)). More specifically, of the dozens of items requested, defendants asserted that a handful had been either fully or partially "provided" (see, e.g., Ex. 6 to 4th Shotwell Decl. at ¶¶ 3(a), 3(b), 3(i), 3(j), 3(s)) and that "plaintiffs should have" another fifteen or so items in whole or in part. (See, e.g., Ex. 6 to 4th Shotwell Decl. at ¶¶ 3(e), 3(g), 3(m)).

Whatever the distinction between these terms, even if plaintiffs were indeed given these documents, the need for defendants' compliance with the remainder of plaintiffs' discovery requests and our related orders was and is not obviated. The requested discovery that was undisputably not turned over was more than sufficient to warrant our order that affidavits or declarations be provided. Furthermore, plaintiffs continue to seek even those documents earlier alleged by defendants to be in plaintiffs' possession. (Compare 4th Shotwell Decl. at ¶¶ 17, 19 with Ex. 6 to 4th Shotwell Decl.). Indeed, this disagreement, as well, might have been clarified had defendants elected to comply with our orders.

> Plaintiffs' claims that: (1) CRV is the alter-ego and
> successor employer of CAR-WIN; (2) CRV and CAR-WIN
> constitute a single employer; (3) CRV was incorporated to
> avoid CAR-WIN's obligations under Trust Agreements and
> Collective Bargaining Agreements with the Plaintiffs; and
> (4) CRV is liable to the Plaintiffs[] for failure to pay
> wages, failure to make fringe benefit contributions and
> failure to employ UNION members in their work
> jurisdiction.

(4th Shotwell Decl. at ¶ 16; see also id. at ¶ 20, 23-24).

None of this is new, however. The positions of the parties are the same as they were during the last round of motion practice: Plaintiffs seek documents that defendants claim do not exist or have never existed. (See Decl. of George Christopoulos dated Feb. 21, 2014 [docket no. 52] at ¶ 3).

In our January 2, 2014 order, we acknowledged that a genuine inability to produce documents responsive to requests does not automatically warrant a default judgment -- hence our avoidance at that stage of imposing a default and our ordering the provision of affidavits or declarations describing defendants' document retention policies and specific actions undertaken to locate the requested documents, along with the depositions of the affiants or declarants that would have followed. (See Order dated Jan. 2, 2013 pp. 10-12).

Defendants' refusal to follow our instructions undermines their assertion that they have truly provided all they have, returning plaintiffs to the untenable position of having to litigate a case based on documents that have been withheld from them and that may or may not exist. Moreover, to further emphasize the prejudice that plaintiffs are facing, we address two arguments made to us in the parties' most recent memoranda, one by plaintiffs and the other by defendants.

First, plaintiffs alert us to the following: Between the date on which plaintiffs' supplementary papers were due on their first motion for default and the date on which we issued our order on that motion, plaintiffs' counsel deposed Mr. Tom Carroll, the president and sole shareholder of Car-Win. (4th Shotwell Decl. ¶ 8; see also Ex. A p. 4 to 3d Shotwell Decl.). An excerpt of that deposition is included as an exhibit to the declaration of plaintiffs' counsel. (See Ex. 7 to 4th Shotwell Decl.). As counsel phrases it, "[a]t his deposition, Mr. Carroll denied ever reviewing the discovery produced by CAR-WIN in this action and, in fact, identified inaccuracies in CAR-WIN's first narrative response to the Demands." (4th Shotwell Decl. ¶ 8).

Indeed, at the deposition, plaintiffs' counsel asked Mr.

Carroll about a certain list of responses to plaintiffs' discovery requests. (See Ex. 7 to 4th Shotwell Decl. at p. 4). This was a document that Mr. Carroll himself had signed. (See Ex. A p.4 to 3d Shotwell Decl.). Yet, when pressed at the deposition, he professed not to know who had prepared it or who had asked him to sign. (Ex. 7 to 4th Shotwell Decl. at p. 4). Moreover, he easily pointed out that at least one of the items he had listed as never having existed was, in fact, an extant document. (See Ex. 7 to 4th Shotwell Decl. at p. 4; Ex. A p.4 ¶ 5 to 3d Shotwell Decl.).

With this as context, the affidavits or declarations specifying defendants' document retention policies and the nature of their searches for the allegedly unavailable documents would have been a lifeline of clarity for plaintiffs. Their absence is obviously highly prejudicial to plaintiffs.

This brings us to our last point on the topic of prejudice. In defendants' attorney's most recent declaration, he takes issue with the following language from plaintiffs' motion papers: "[T]he majority of the documents that have not been produced by the Defendants are material and necessary to proving the Plaintiffs' claims." (Decl. of George Christopoulos dated Feb. 21, 2014 [docket no. 52] at ¶ 7). On this front, defendants' counsel makes the

startling assertion that "I have never heard of one side requiring proofs from the other to prove their case? I did not realize that the Defendants are required to assist the plaintiffs in meeting their burden[]...Defendants are under no obligation to assist the Plaintiffs in proving their case." (Id.).

This assertion is truly astonishing. Defendants' counsel appears to forget that "[t]he purpose of discovery is to allow a broad search for facts, the names of witnesses, or any other matters which may aid a party in the preparation or presentation of his case." Fed. R. Civ. P. 26(b) Advisory Committee Note [1946 Amendment] at Subdivision (b) (West 2014); Asante-Addae v. Sodexo, Inc., 2014 WL 2013433, *3 (D. Conn. May 16 2014); United States v. Int'l Business Machines Corp., 68 F.R.D. 315, 316 (S.D.N.Y. 1975). The Supreme Court has been unequivocal in this respect:

> The various instruments of discovery now serve...as a device for ascertaining the facts, or information as to the existence or whereabouts of facts, relative to those issues. Thus civil trials in the federal courts no longer need be carried on in the dark. The way is now clear, consistent with recognized privileges, for the parties to obtain the fullest possible knowledge of the issues and facts before trial.

Hickman v. Taylor, 329 U.S. 495, 501 (1947). Purposefully limiting one's adversary's access to discoverable information is undoubtedly

prejudicial, even to the extent that this information "assist[s] the Plaintiffs in proving their case." (Decl. of George Christopoulos dated Feb. 21, 2014 at ¶ 7).

## C. Defendants' Additional Arguments Against Default

Defendants oppose this motion for reasons beyond those directly responsive to plaintiffs' factor-based arguments. They also suggest, somewhat disjointedly, (1) that any current delays are due specifically to plaintiffs' inaction, (2) that plaintiffs' own conduct during discovery justifies whatever non-compliance defendants are being accused of, and (3) that even if defendants have not been entirely compliant with their obligations, their partial compliance should save them from default. (See Opp. Mem. 2-4). We reject each of these arguments and address them below.

### i. Plaintiffs' Alleged Non-Compliance with the January 2, 2014 Order

As to the first point, defendants repeatedly cite our January 2, 2014 order and accuse plaintiffs of having defied our instructions. In doing so, defendants seemingly read our order to be saying only that we were permitting plaintiffs to take

42

depositions of those with knowledge of defendants' document retention policies and search for the documents at issue. (See Opp. Mem. 1, 3, 4; Decl. of George Christopoulos dated Feb. 21, 2014 ¶ 3). Defendants write as follows:

> As to the Court's January 2, 2014 Order the Defendants have been and continue to be available to be deposed with regard to the alleged outstanding discovery demands...However, plaintiffs' must serve notices to depose along with the Court's January 2, 2014 Order for the Defendants to comply[,] e-mails requesting mutually convenient dates/times do not suffice.

(Opp. Mem. 3). Defendants go on to quote Rule 30(b)(1) of the Federal Rules of Civil Procedure and state that "Plaintiffs never abided by said rule in conjunction with the Court's January 2, 2014 Order." (Id.). And defendants repeat this refrain over and over. (See, e.g., id. at 1, 4; Decl. of George Christopoulos dated Feb. 21, 2014 ¶ 3). In his declaration, defendants' counsel frames this argument as follows: "[P]laintiffs have been free to depose CRV and Car-Win with regard to the alleged outstanding discovery and it is certainly not the Defendants['] fault that plaintiffs have sat on their hands." (Decl. of George Christopoulos dated Feb. 21, 2014 ¶ 3; see also id. at ¶ 5).

Our January 2, 2014 order, however, was eminently clear: Defendants were required to provide the affidavits or declarations within one week of the issuance of the order and, subsequent to

43

defendants' compliance, "plaintiffs [were] authorized to take the deposition of any affiants or declarants." (Order dated Jan. 2, 2014 p. 10). We explicitly stated that "[a]ny such deposition is to be conducted within one week after receipt of the required affidavits or declarations." (Id.).

It is difficult to know what to make of defendants' argument on this point. Taking defendants' (and defendants' counsel's) confused statements in a vacuum, it appears that defendants misread our order to mean that they could do nothing and wait for plaintiffs to formally notice certain depositions. However, in light of both the explicit language of the order and the full record before us, this is, at best, a wholly unreasonable interpretation. At worst, and more realistically understood, it is a bad-faith attempt at masking their deliberate and willful non-compliance with our order.

Again, the text of our order was explicit. Moreover, we discussed this requirement with counsel -- the very same individual who drafted defendants' memorandum in opposition to the current motion and the attached declaration -- and addressed the requirement of the affidavits or declarations on the record. (See Jan. 31, 2014 Tr. 5). Plaintiffs made repeated and clear references

44

to the nature of our order in their memorandum in support of
default. (See, e.g., Pls.' Mem. 9). And, perhaps most bizarrely,
defendants' counsel's declaration includes a seemingly self-
contradictory reference to the affidavits, which again reveals that
he understood the substance of our January 2, 2014 order. (See
Decl. of George Christopoulos dated Feb. 21, 2014 ¶ 5).[16]

Whatever the explanation for defendants' apparent confusion on
this issue, one thing is abundantly clear: Defendants -- not
plaintiffs -- are at fault for the lack of subsequent noticed
depositions.

### ii. Plaintiffs' Alleged General Non-Compliance with Discovery Obligations

Defendants' next justification for non-compliance is as
meritless as it is familiar: that plaintiffs' alleged discovery
failures should affect our current assessment of defendants' own
misconduct. (See, e.g., Opp. Mem. 1, 3, 4; Decl. of George

---

[16] Plaintiffs' counsel also provides us with a copy of a short email,
dated January 2, 2014, which she sent to defendants' counsel subsequent to the
issuance of order. (Ex. 9 to 4th Shotwell Decl.). There, she wrote to
defendants' counsel that "[w]e look forward to the declarations/affidavits
ordered to be produced within the next week." (Id.). Additionally, she
attaches a follow-up letter sent to defendants' counsel on January 10, 2014,
after defendants failed to comply with our order. (Ex. 10 to 4th Shotwell
Decl.).

45

Christopoulos dated Feb. 21, 2014 ¶¶ 3, 7, 10-12).

On this point, we stress that "[d]iscovery is not equity: one party's noncompliance with discovery requirements does not excuse the other's failure to comply. Each party's obligation is independent." Gropper v. David Ellis Real Estate, L.P., 2014 WL 518234, *3 (S.D.N.Y. Feb. 10, 2014); see also John Wiley & Sons, Inc. v. Book Dog Books, LLC, 298 F.R.D. 145, 148 (S.D.N.Y. 2014) ("[I]t is well-established that a party cannot unilaterally refuse to fulfill its discovery obligations as retaliation for another party's discovery violations."); Lumbermens Mut. Cas. Ins. Co. v. Maffei, 2006 WL 2709835, *5 n.21 (D. Alaska Sept. 20, 2006) ("The court does not consider 'tit-for-tat' objections to discovery to be legitimate."). Indeed, "[t]he federal rules...contain no provision authorizing a litigant to behave only as well as his opponent." Acushnet Co. v. Birdie Golf Ball Co., 166 F.R.D. 42, 43 (S.D. Fla. 1996).

Defendants lob numerous accusations at plaintiffs, all of which essentially amount to complaining about plaintiffs' own withholding of discovery sought by defendants: "[P]laintiffs have not provided any discovery with respect to the Defendants' discovery demand." (Opp. Mem. 1). "[P]laintiffs [] have disregarded

the rules of procedure as they have failed to provide any documents pursuant to the Defendants' document demand." (Id. at 3). "[P]laintiffs [] failed and acted in bad faith by simply objecting to the Defendants' discovery demand and in turn providing nothing." (Id.). "The only slothful and evasive approach to discovery has been and remains plaintiffs' objections to the Defendants' discovery demands and their failure to provide any documents whatsoever." (Id. at 4; see also Decl. of George Christopoulos dated Feb. 21, 2014 ¶¶ 11-12).

At the very end of his declaration, defendants' counsel directs us to plaintiffs' response to defendants' document requests and correctly points out that "plaintiffs objected to each and every demand." (See Decl. of George Christopoulos dated Feb. 21, 2014 at ¶ 11 & Ex. C). Then, counsel concludes by stating, "[f]or the for[e]going reasons it is respectfully requested that plaintiffs' motion is denied and moreover that plaintiffs' are compelled to provide answers to Defendants' discovery demands." (Id. at ¶ 12).

Even if we assume, for the sake of this argument, that plaintiffs' objections to defendants' discovery demands were unreasonable, those objections have no bearing on defendants' own

47

behavior and are irrelevant to the analysis here. As is abundantly clear from the decisions mentioned above, see supra pp. 46-47, and, indeed, from the very nature of our focused adversarial system, the proper way for defendants to deal with plaintiffs' behavior in discovery was to make applications to the court requesting an order to compel production, sanction the lack thereof, or move for some other directed relief.

Indeed, we note that, during the pendency of plaintiffs' first motion for a default judgment, defendants also raised plaintiffs' objections to defendants' discovery demands. (See, e.g., Decl. of George Christopoulos dated July 2, 2013 at ¶¶ 4-5). And in our January 2, 2014 order, we stated as follows:

> We note that at several points defendants allude in their papers to asserted failures by plaintiffs to supply discovery. We have received no application by defendants for relief from any shortfalls in plaintiffs' performance, and we decline to address this issue since defendants have not properly, or timely, raised it. Defendants also should expect no further adjustments of the discovery deadlines to accommodate last-minute discovery efforts by them.

(Order dated Jan. 2, 2014 p. 13 n.2) (citations omitted). Defendants' apparent attempt to wedge an application to compel plaintiffs' production into a single line of a declaration in opposition to the current motion (see Decl. of George Christopoulos dated Feb. 21, 2014 at ¶ 12) is neither remotely sufficient as a

stand-alone request for relief nor cause to justify defendants' own
failures to produce what was required of them.

### iii. Relevance of Defendants' Partial "Compliance"

Finally, we note that the bulk of defendants' memorandum in
opposition to default is taken up with what defendants have managed
to accomplish since the commencement of this lawsuit. (See Opp.
Mem. 1-4). They appear to be implying that any amount of
participation in litigation saves them from dispositive sanctions.
(Id.).

Defendants remind us that "they have submitted an answer,
initial disclosures and discovery responses." (Id. at 3). No
mention, however, is made there of the extreme delays that --
perhaps with the exception of Car-Win's answer -- attended each of
these submissions. See supra pp. 8-18.

Defendants' counsel also reiterates his stance on the
discovery at the heart of both motions for default: "I have
provided copies of all documents that were forwarded to this office
by CRV and Car-Win and I have not precluded the plaintiffs from any
additional discovery." (Opp. Mem. 1). He repeats several times that

49

"this office has provided copies of all documents to the plaintiffs as they were provided to the undersigned by the Defendants." (Id. at 2). He ignores the fact that the disclosure obligation is that of the clients, who cannot avoid their obligation based on their attorney's faithful transmission to their adversary of only that which defendants gave him. He further ignores the fact that, due to the questions that arose the last time he made this argument, we had ordered that defendants provide the affidavits or declarations that never materialized. See supra pp. 16-17.

Additionally, defendants inform us (as plaintiffs themselves had) that they did, in fact, produce one individual for a deposition and that defendants' counsel and a "representative" traveled to plaintiffs' offices to help review the produced discovery. (Opp. Mem. 3; see also Decl. of George Christopoulos dated Feb. 21, 2014 at ¶¶ 3, 5).

The central legal principle undergirding defendants' argument in this respect appears to be something of a straw man built out of plaintiffs' own words. Defendants quote plaintiffs' memorandum out-of-context for the proposition that "Courts have routinely held that a default judgment is an appropriate sanction against parties that have totally failed to respond to outstanding discovery

50

requests." (Id. (quoting Pls.' Mem. 7)). Defendants then proceed to
apply that statement to our case by explaining that they "have not
totally failed to respond to plaintiffs' discovery demand." (Opp.
Mem. 3). Later, defendants repeat that "the Court is well aware and
as the plaintiffs have conceded[,] the Defendants did not and have
not wholly failed to respond to plaintiffs' discovery demand."
(Id.).

      Yet, defendants fail to read plaintiffs' memorandum as a
whole, which by no means asserts that default is an appropriate
remedy only where the non-compliant target of the sanction has
"totally failed," a principle not at all grounded in relevant case-
law. Indeed, plaintiffs include a footnote to the very line quoted
by defendants, which explains that "Rule 37 sanctions have [also]
been imposed against parties that have produced inadequate
responses to an adversary's discovery requests." (Pls.' Mem. 7).
Defendants equally ignore the governing legal standards under Rule
37, which demonstrate that the level of participation exhibited in
this case by defendants -- or lack thereof -- more than suffices to
meet the standards to be used in assessing motions for default
judgment under Rule 37. See, e.g., Nat'l Hockey, 427 U.S. at 642;
S. New England, 624 F.3d at 149 (quoting Cine Forty-Second St., 602
F.2d at 1068); In re Tartaglione, 2008 WL 336844, at *3.

Finally, we take the opportunity to point out one other assertion made by defendants' counsel: "There has never been any callous disregard by the undersigned with regard to this matter as I have cooperated with the Court and plaintiffs' counsel to the best of my ability." (Opp. Mem. 3). This theme -- that defendants' counsel was doing the best he could with what he was given -- runs throughout the record before us. Elsewhere in his memorandum, defendants' counsel writes that "this office has provided copies of all documents to the plaintiffs as they were provided to the undersigned by the Defendants." (Id. at 2) (emphasis added). At the January 31, 2014 conference, counsel said the same: "I provided, your Honor, what I received from my clients to my adversary. That's all I have, Judge...I have advised them what needs to be provided, Judge. It hasn't been given to me. That's all I can tell you." (Jan. 31, 2014 Tr. 4-5).

However, to the extent that defendants' counsel is suggesting that his clients are more directly responsible for the delays and delinquencies that took place during discovery -- a reality that may very well be true -- that argument only serves to undercut defendants' opposition to the motion at hand. The Second Circuit has generally been least willing to uphold dispositive discovery sanctions when the misconduct was attributable to attorney

52

"sloppiness or negligence." See World Wide, 694 F.3d at 160; Picardo v. C.R. Bard, Inc., 563 F. App'x 58, 62 (2d Cir. 2014). In such cases, dispositive relief is less appropriate and "sanctions should be imposed on the attorney, and not bar [the non-compliant party] from a full presentation of its case." World Wide, 694 F.3d at 160.

Here, defendants can make no such argument.

## II. Recommendation of Default with Inquest to Follow

As mentioned, we recommend that a default be entered against both defendants in this case. We also recommend that -- in addition to the audit that we will discuss below, see infra pp. 57-68 -- an inquest be conducted subsequent to the default and audit, to determine the precise amount of damages to be awarded to plaintiffs.

"Although 'a default judgment entered on well-pleaded allegations in a complaint establishes a defendant's liability,' it does not reach the issue of damages." Trs. of the Mason Tenders Dist. Council Welfare Fund v. Stevenson Contracting Corp., 2008 WL 3155122, *4 (S.D.N.Y. June 19, 2008) (quoting Bambu Sales, 58 F.3d

53

at 854). Indeed, "a default is not an admission of damages, which must be established in a separate evidentiary proceeding." Finkel v. Romanowicz, 577 F.3d 79, 83 n.6 (2d Cir. 2009). "The burden is on the plaintiff to establish entitlement to the recovery of damages." Norcia v. Dieber's Castle Tavern, Ltd., 980 F. Supp. 2d 492, 500 (S.D.N.Y. 2013). And, "[e]ven where a party has defaulted, it may still contest the amount of damages awarded to a plaintiff." Finkel, 577 F.3d at 83 n.6; see also Norcia, 980 F. Supp. 2d at 500.

Indeed, in cases similar to ours -- default judgments sought and obtained by unions against corporate defendants in violation of, inter alia, benefit-fund contribution obligations under ERISA-governed CBAs -- courts have consistently held an inquest necessary to determine damages. See, e.g., Local No. 46 Metallic Lathers Union & Reinforcing Iron Workers Welfare Trust v. Brookman Constr. Co., Inc., 2013 WL 5304358, *3-*6 (E.D.N.Y. Sept. 19, 2013); Trs. of the Operative Plasters and Cement Masons' Int'l Ass'n et al. v. Mimosa Int'l, Ltd., 2013 WL 1718913, *2-*11 (S.D.N.Y. Apr. 16, 2013) ("Plaintiffs are entitled to a default judgment on liability in this case...The default judgment alone, however, does not establish Plaintiffs' damages."); Stevenson, 2008 WL 3155122, *4-*12; see also Annuity, Welfare and Apprenticeship, Skill

Improvement & Safety Funds of the Int'l Union of Operating Engineers v. J&A Concrete Corp., 2013 WL 2467998, *5-*6 (S.D.N.Y. June 6, 2013).

As in these cases, an inquest is needed here. Plaintiffs' complaint details allegations that relate both to liability and to damages. (See, e.g., Compl. ¶¶ 13-17, 31-33). Upon entry of a default against defendants, they will be deemed to have admitted to the following: (1) that Car-Win and CRV are alter-egos, equally obligated under the terms of the CBA, and jointly and severally liable for each other's debts and obligations; (2) that Car-Win and CRV both -- at various points in time prior to (and, reading the complaint in tandem with plaintiffs' other submissions, subsequent to) the filing of the complaint -- violated the CBA by not paying the required wages or making the benefit contributions for work performed in the craft and geographic jurisdiction of the unions; (3) that Car-Win did not provide access to its financial records for the period of May 24, 2010 through May 31, 2011; and (4) that Car-Win defaulted on payments due under the June 24, 2010 settlement agreement and subsequent judgments.

While there is some amount of relevant evidence scattered throughout the record before us, it is an entirely insufficient

basis on which to conduct an evaluation on damages at this stage. Nor, importantly, have defendants yet been given the "opportunity to contest the plaintiff[s'] claims [on damages]." <u>Norcia</u>, 980 F. Supp. 2d at 500. Therefore, subsequent to an entry of default, we recommend that plaintiffs be ordered to return to this court for a post-default inquest, for which they should provide affidavits and documentary evidence detailing the nature and extent of their damages and in response to which defendants may submit evidence of their own.

Plaintiffs' briefing on an inquest should entail a showing with respect to (1) the unpaid wages and benefit contributions, (2) the related damages consisting of interest, attorney's and auditor's fees, and liquidated damages, and (3) that which was already paid and that which remains due and owing under the June 2010 settlement agreement and associated judgments. We emphasize that this showing requires reference to both documents and other evidence reflecting defendants' violations as well as direct citations to the governing provisions of the CBA and incorporated Trust Agreements, where relevant.

III. Application for Injunctive Relief Requiring Defendants to
Submit to an Audit

A. Applicable Legal Framework

In addition to plaintiffs' application for a default judgment
under Rule 37, they also seek an order "requiring the DEFENDANTS to
submit to an audit of their financial books and records for the
period of January 1, 2008 to the present." (Pls.' Mem. 15).[17]

We note at the outset that, in an action to enforce ERISA-
mandated contributions to benefit funds, see Section 515 of ERISA,
codified at 29 U.S.C. § 1145, courts are authorized to grant
successful plaintiffs "equitable relief as the court deems
appropriate." Section 502(g)(2)(E) of ERISA, codified at 29 U.S.C.
§ 1132(g)(2)(E). Indeed, "it is well-settled that ERISA grants the
court wide discretion in fashioning equitable relief to protect the
rights of pension fund beneficiaries." Chao v. Merino, 452 F.3d
174, 185 (2d Cir. 2006); accord Beck v. Levering, 947 F.2d 639,

---

[17] Plaintiffs' memorandum in support of their motion is not perfectly
consistent as to which defendants are being targeted in this request. On the
one hand, the heading for this section of their memorandum only asks for an
audit of CRV. (Pls.' Mem. 14). Nevertheless, as the substance of their
argument is clearly directed at both defendants (Pls.' Mem. 15-16), we frame
what follows in those terms. We note, however, that this discrepancy might be
attributable to the fact that plaintiffs have requested an audit of Car-Win on
a previous occasion, which we will discuss below. See infra pp. 65-67.

641-42 (2d Cir. 1991).

It is also "well settled that 'equitable relief in this context includes an injunction requiring a defendant to permit, and cooperate with, an audit of its books and records.'" Int'l Union of Operating Engineers Local 98 v. Shawn's Lawns, Inc., 2012 WL 1405786, *4 (D. Mass. Apr. 17, 2012) (quoting Int'l Painters & Allied Trades Indus. Pension Fund v. Zak Architectural Metal & Glass LLC, 635 F. Supp. 2d 21, 26 (D. Md. 2009)); see also Trs. of the Plumbers Local Union No. 1 Welfare Fund v. Arista Plumbing Heatings and Piping Corp., 2014 WL 888377, *7 (E.D.N.Y. March 16, 2014) ("Courts have regularly granted such requests using Section 502(g)(2)(E) as the statutory basis for an order compelling a defendant-signatory to produce books and records in compliance with their CBA obligations under ERISA.") (citing cases); Empire State Carpenters Welfare v. M.V.M. Contracting Corp., 2011 WL 887726, *2 (E.D.N.Y. Jan. 31, 2011); Mason Tenders Dist. Council Welfare Fund v. A.G.I., Inc., 2005 WL 1565831, *4 (S.D.N.Y. June 8, 2005) ("The United States Supreme Court has held that the right of employee-benefit plan trustees to conduct such audits of contributing employers is consistent with the provisions of ERISA.") (citing Central States, Southeast and Southwest Areas Pension Fund v. Cent. Transp., 472 U.S. 559, 573 (1985)); Mason Tenders Dist. Council

Welfare Fund v. Bold Constr. Co., Inc., 2002 WL 1788024, *3
(S.D.N.Y. Aug. 1, 2002).

We recognize that although ERISA authorizes equitable relief,
see 29 U.S.C. § 1132(g)(2)(E), "injunctive relief does not follow
automatically upon a finding of statutory violations." Mimosa
Int'l, 2013 WL 1718913, at *11 (internal quotations omitted).
Instead, "plaintiffs must also show irreparable harm and the
absence of an adequate remedy at law." Id. (internal quotation
omitted); see also King v. STL Consulting, LLC, 2006 WL 3335115, *9
(E.D.N.Y. Oct. 3, 2006) (citing cases). Put a different way, the
party seeking injunctive relief "must show that the injury it will
suffer is likely and imminent, not remote or speculative, and that
such injury is not capable of being fully remedied by money
damages." La Barbera v. Les Sub-Surface Plumbing, Inc., 2008 WL
906695, *10 (E.D.N.Y. Apr. 3, 2008) (quoting NAACP v. Town of E.
Haven, 70 F.3d 219, 224 (2d Cir. 1995)); King, 2006 WL 3335115, at
*9; Norcom Electronics Corp. v. CIM USA Inc., 104 F. Supp. 2d 198,
209 (S.D.N.Y. 2000); see also Cablevision of S. Conn., Ltd. P'ship
v. Smith, 141 F. Supp. 2d 277, 288 (D. Conn. 2001).

We note that courts in this Circuit are somewhat inconsistent
with regard to whether, and to what extent, to apply this

relatively strict standard to requests to audit defendants in ERISA contribution cases. Compare A.G.I., 2005 WL 1565831, at *4-5 with La Barbera, 2008 WL 906695, at *10. In any case, we find that plaintiffs meet the applicable standards, since an audit is necessary for plaintiffs (and the court) to determine what defendants owe on their CBA obligations. We therefore recommend that defendants be ordered to submit to an audit as we will describe below.

## B. Order Requiring CRV and Car-Win to Submit to an Audit of Financial Records

As mentioned, plaintiffs' now seek an order "requiring the DEFENDANTS to submit to an audit of their financial books and records for the period of January 1, 2008 to the present." (Pls.' Mem. 15). In plaintiffs' memorandum in support of their motion, they explain that "this equitable relief is appropriate and necessary because the Plaintiff[s] cannot determine and recover monetary damages without access to the DEFENDANTS['] books and/or invoices." (Id.). With this in mind, we recommend fully granting plaintiffs' request with respect to CRV, but granting the request in somewhat more limited form with respect to Car-Win.

i. <u>Plaintiffs' Request to Audit CRV's Financial Records</u> <u>from January 1, 2008 Through the Present Should be</u> <u>Granted</u>

Plaintiffs explicitly recognize the oft-cited requirements that applicants for equitable relief show "irreparable harm" and "absence of an adequate remedy at law," although they apply them in fairly skeletal fashion to the facts presented here. (<u>See</u> <u>id.</u> at 15-16 (quoting <u>La Barbera</u>, 2006 WL 906695, at *10)). Plaintiffs explain that, absent equitable relief, they "will suffer irreparable injury, as CRV will continue operations and shirk its obligations to contribute to the FUNDS under the CBA." (Pls.' Mem. 15). Plaintiffs then inform us that "CRV has been awarded a contract to perform work on an affordable housing job known as the 'Schoolhouse Terrace' project located at 33 Ashburton Avenue in Yonkers, New York in the imminent future." (<u>Id.</u>).

We take plaintiffs' sparse application to be making the following argument: In the wake of a default judgment on liability, plaintiffs will be required to detail to this court the nature of the damages suffered. A default on liability will deem CRV responsible for Car-Win's obligations under the CBA. <u>See</u> <u>supra</u> pp. 55-56. Plaintiffs already have some evidence suggesting that CRV is presently engaged in shirking those obligations, which itself

61

suggests that the damages to be ultimately sought will exceed those initially delineated in the complaint. An order requiring an audit of CRV's financial records is needed to fully brief this court about both pre- and post-complaint damages[18] -- a point that is underscored by CRV's history of refusing to comply with document requests during the pendency of this lawsuit.[19]

---

[18] A short declaration from plaintiffs' auditor is included as an exhibit to the motion, and it further emphasizes plaintiffs' inability to assess damages without a thorough audit. (See Ex. 1 to 4th Shotwell Decl.). The auditor notes that "[i]n situations where a signatory contractor does not provide access to its books and records...I can alternatively utilize invoices prepared by the contractor to estimate labor costs." (Id. at ¶ 4). He explains that "I have performed dozens of audits where I was provided only with invoices of the work performed." (Id. at ¶ 7). However, "[w]here invoices are unavailable, I am hard-pressed to accurately assess the amount of fringe benefit contributions to the UNION SECURITY FUNDS." (Id. at ¶ 8). Meaning, to show damages, plaintiffs need either these invoices or access to defendants' records in the form of the audit now sought -- and plaintiffs have already tried and failed to obtain the invoices.

In her declaration in support of the motion, plaintiffs' counsel points to invoices requested but not provided. (4th Shotwell Decl. at ¶¶ 20-22). In the process, she asserts that "[t]here is no indication that the invoices do not exist or cannot be located." (Id. at ¶ 21). In direct response to this point, defendants' counsel offers up a number of arguments he elsewhere employs, such as that "Defendants are not obligated to prove plaintiffs' case" and "plaintiffs have yet to provide any documents pursuant to the Defendants' document demand." (Decl. of George Christopoulos dated Feb. 21, 2014 at ¶ 9). We have already discussed these specious arguments. See supra pp. 40-42, 45-49. Here, however, defendants' counsel adds a bewildering sentence that, on its face, appears to suggest that defendants do, indeed, possess the withheld invoices -- which further weighs in favor of the usefulness of an audit: "Moreover, at no point did I ever claim that defendants' answers to plaintiffs' discovery demand is or was conclusive." (Decl. of George Christopoulos dated Feb. 21, 2014 at ¶ 9).

[19] Of course, it is possible -- given the history of this case -- that defendants may frustrate plaintiffs' efforts to audit defendants' financial records. Defendants have already shown themselves willing to sidestep similar, if not significantly less intrusive, court orders. We therefore stress that any order granting such relief should be accompanied by a strict time-line. If defendants then refuse to comply, the court will be able to take this into account during the inquest -- for which plaintiffs will have to present what evidence they have managed to gather thus far. Moreover, with respect to defendants' possible non-compliance with yet another order, we emphasize the court's ability to hold parties in contempt. See, e.g., Trs. of the Buffalo

Without equitable relief of this sort -- before the start of an inquest -- plaintiffs will suffer harm that is undoubtedly "not remote or speculative." See La Barbera, 2008 WL 906695, at *10 (quoting NAACP, 70 F.3d at 224). They will be unable to properly seek a well-grounded damages award from this court, precluding them from being "remedied by money damages." Id. Accordingly, in order to enable plaintiffs to determine the amount of unpaid contributions owed to them, CRV should be ordered to submit to an audit of its financial records from January 1, 2008 to the present.

Anticipating a possible objection to this recommendation, we note the following: In defendants' opposition to this motion, they make no reference to the time-frame of the sought-after audit. However, we note that, earlier in this case, they maintained that "CRV was organized on or about May of 2009." (See Ex. 6 at ¶¶ 3(p)-(s) to 4th Shotwell Decl.). Indeed, this was one of their justifications for refusing to supply plaintiffs with the requested discovery. (Id.; see also Ex. 5 p. 2 to 4th Shotwell Decl.). Presumably, then, defendants would argue that any audit of CRV's financial records prior to May 2009 would be a futile endeavor.

---

Laborers' Pension Fund v. Accent Stripe, Inc., 2007 WL 1540267, *4-5 (W.D.N.Y. May 24, 2007) (discussing plaintiffs' motion for contempt for defendant's failure to cooperate with a financial audit).

As we have repeatedly explained, however, defendants were given the opportunity to legitimate their justifications by supplying the ordered affidavits or declarations, which would have been followed by depositions of the affiants or declarants. Having refused to comply with our order, their statement that CRV did not exist until May 2009 should be for plaintiffs to verify via their requested audit. Indeed, in plaintiffs' counsel's most recent declaration, she continues to seek relevant documents from CRV from before May 2009 (see 4th Shotwell Decl. at ¶ 19), despite defendants' representation that CRV did not exist at that time.

It should therefore be within the auditor's authority to explore this point of contention, and we decline to recommend limiting the ordered audit to the post-May 2009 period.

### ii. Plaintiffs Application to Audit Car-Win's Financial Records Should be Granted for a Portion of the Period Requested

Plaintiffs seek to audit Car-Win's financial records covering the same period as CRV, namely, post-dating January 1, 2008. (Pls.' Mem. 15). Unlike with respect to CRV, however, we recommend limiting the order requiring Car-Win to submit to the audit to the following periods: (1) May 24, 2010 through May 31, 2011 and (2)

64

June 21, 2012 through the present.

This is not the first time that plaintiffs have asked for a court order requiring Car-Win to submit to an audit. (See Compl. ¶ 40). In the complaint, plaintiffs stated as follows: "CARWIN breached the provisions of the C.B.A. by failing to allow Plaintiffs to schedule and complete an audit of CARWIN's books and records for the period May 24, 2010 through May 31, 2011." (Id. at 36). As a claim for relief, plaintiffs therefore sought the following: "CARWIN shall be required to provide access to its records for the period May 24, 2010 through May 31, 2011 so that the audit can be completed, and pay all contributions to be due upon completion of the audit." (Id.). Moreover, elsewhere in the complaint, plaintiffs noted that "[b]ased on an audit report of CARWIN's books and records, CARWIN failed to pay benefit contributions due for the period August 1, 2008 through July 26, 2009." (Id. at ¶ 42).

The implication of each of these paragraphs is clear: As of the filing of the complaint, which took place on June 21, 2012 (see docket no. 1), plaintiffs had already audited Car-Win for all prior relevant time-periods except for May 24, 2010 through May 31, 2011. As such -- although the justification for authorizing an audit of

65

CRV applies equally to Car-Win, see supra pp. 61-63 -- plaintiffs should not be able to exploit their current position by repeating audits already performed.

We also note that -- mirroring the above-mentioned lack of clarity surrounding when CRV was founded, see supra pp. 63-64 -- there is some disagreement about when Car-Win ceased to exist. Defendants' position appears to be that "Car-Win ceased operations after September of 2009." (See Ex. 6 at ¶ 3(l) to 4th Shotwell Decl.). Defendants' have also stated that "Car-Win had no employees after September of 2009." (Id. at ¶ 3(i); see also Apr. 17, 2013 Tr. 3 ("[O]ne defendant, Car-Win, has been out of business for three years.")). Plaintiffs, however, counter this representation by supplying evidence to the contrary, including pay-stubs issued to a Car-Win employee for April, May, June, and July of 2010. (See 4th Shotwell Decl. at ¶ 18 & Ex. 15). Thus, vis-a-vis Car-Win, the requested audit should also not be limited pursuant to defendants' own representations as to the temporal scope of its existence.

We therefore recommend ordering Car-Win to submit to an audit of its financial records for the above-mentioned periods.

## C. Defendants' Opposition to Plaintiffs' Request for an Audit

We conclude by briefly addressing defendants' arguments in opposition to plaintiffs' application for an order mandating an audit. In their memorandum, defendants fixate on the prong of equitable-relief analysis that requires movants to show that their alleged injuries are "not capable of being fully remedied by money damages." (Opp. Mem. 5 (quoting Le Barbera, 2008 WL 906695, at *10)). Defendants assert, multiple times, that "this case is all about money." (Opp. Mem. 4, 5). Confusingly, defendants pick one request for relief contained in the complaint and state that "plaintiffs' alleged injury will only be remedied by the aforesaid $546,215.35 assuming they are able to prove their case and are awarded said amount." (Id. at 5). Defendants refer to some assertedly unclear portion of plaintiffs' allegations as "nothing more than window dressing" and state that "as such they are not entitled to injunctive relief." (Id. at 4).

Whatever defendants are precisely arguing here, we note that, as mentioned, plaintiffs are unable to reach the question of damages without the requested audits. See supra pp. 61-64. Defendants' formalistic focus on the ultimate relief at stake in this case is misplaced. Courts have repeatedly found audits to be

appropriate remedies subsequent to default, see cases cited supra pp. 57-59, and we do so here as well.

Finally, defendants appear to argue that plaintiffs' request for equitable relief was impermissible under our January 31, 2014 order. (Opp. Mem. 5). Defendants assert the following:

> Your Honor's January 31, 2014 Order specifically provides that 'if the plaintiffs wish to file a motion for default or alternative discovery sanctions, they are to do so by no later than February 14, 2014.' Your Honor's Order was very specific and a request for injunctive relief is not an 'alternative discovery sanction.' As such, plaintiffs' request for injunctive relief should be denied as...plaintiffs' request for injunctive relief exceeds Your Honor's January 31, 2014 Order.

(Id.). We need not address whether audits can be ordered as Rule 37 discovery sanctions. As noted, a default may be entered as a sanction, and upon default the court must necessarily determine what relief -- whether legal or equitable -- should be awarded the plaintiff. In any event, none of our orders purported to preclude plaintiffs from seeking an audit in this case, nor would we have had a legal basis for so doing. Finally, we note that defendants' sudden -- and outrageously selective -- interest in the specificity of our orders is woefully out of place.

**PLAINTIFFS' FEE APPLICATION
IN CONNECTION WITH THEIR FIRST MOTION FOR DEFAULT**

I. Introduction to Fee Application

In our January 2, 2014 order, we "award[ed] plaintiffs the reasonable expense of their motion practice, which ha[d] been necessitated by defendants' slothful approach to their discovery obligations." (Order dated Jan. 2, 2014 p. 12). We instructed plaintiffs to serve and file an affidavit or declaration with accompanying time records within two weeks of our order and instructed defendants to respond within one week thereafter. (Id. at pp. 12-13).

Subsequently, on January 16, 2014, plaintiffs timely filed a declaration in support of their application. (See Decl. of John S. Groarke dated Jan. 16, 201[4] (hereinafter "Groarke Decl.") [docket no. 45]).[20] Defendants did not file a response to Mr. Groarke's declaration within the ordered time-frame or at any point thereafter.

---

[20] Mr. Groarke's declaration is mistakenly dated January 16, 2013.

69

II. Plaintiffs' Application

Plaintiffs have applied for an expense award comprising fees for time spent engaging in work related to motion practice with respect to their April 30, 2013 motion for sanctions. Plaintiffs seek a total of $5,264.00 in fees, reflecting the following: (1) 30.2 hours by Alicia M. Shotwell, Esq., then-second-year associate at Colleran, O'Hara & Mills L.L.P. -- whose practice focuses on ERISA litigation and unpaid benefit contributions -- for which they seek $150.00 per hour, for a total of $4,530.00; (2) 0.10 hours by John S. Groarke, Esq., equity partner at Colleran, O'Hara & Mills L.L.P. -- with twelve years of experience -- for which they seek $200.00 per hour, for a total of $20.00; (3) 4.1 hours by two law clerks, Brittany Johnson -- a then third-year law student -- and William Reinken -- a then-recent law school graduate whose admission to the New York bar was still pending at the time, for which they seek $140 per hour, for a total of $574.00; and (4) one hour by a litigation paralegal with five years of experience, Laura Nastro, for which they seek $140.00 per hour, for a total of $140.00. (See Groarke Decl. at ¶¶ 5-8, 11 & Ex. B).

The application for Ms. Shotwell's time assertedly represents a sixty-percent discount from her standard rate of $250.00 and the

application for Mr. Groarke's time represents a fifty-six percent discount from his standard sate of $360.00 per hour. (Id. at ¶ 12).


III. Assessment of the Application


In assessing plaintiffs' application, we apply the long-recognized criteria under the rubric of a lodestar analysis. See Kim v. Kum Gang, Inc., 2014 WL 2514705, *1 (S.D.N.Y. June 2, 2014); Archie Comics Pubs., Inc. v. Penders, 2012 WL 3245421, *1-2 (S.D.N.Y. Aug. 6, 2012). This assessment results in a "presumptively reasonable fee," Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany, 522 F.3d 182, 190 (2d Cir. 2008), which is "calculated by multiplying 'the number of hours reasonably expended in the litigation...by a reasonable hourly rate.'" Union Cent. Life Ins. Co. v. Berger, 2013 WL 6571079, *3 (S.D.N.Y. Dec. 13, 2013) (quoting Hensley v. Eckerhart, 461 U.S. 424, 433 (1983)). While the resulting lodestar figure "is not conclusive in all circumstances...there is a 'strong presumption' that the lodestar figure is reasonable." Balestriere PLLC v. CMA Trading, Inc., 2014 WL 7404068, *3 (S.D.N.Y. Dec. 31, 2014) (quoting Perdue v. Kenny A., 559 U.S. 542, 552 (2010); see also Archie Comics, 2012 WL 3245421, at *1.

71

First, based on our review of plaintiffs' application (including the underlying work product reflected in their earlier sanctions motion), and in light of defendants' failure to meaningfully oppose it, we find that the number of hours spent on the relevant motion practice is eminently reasonable. See generally Balestriere, 2014 WL 7404068, at *3-4; Taaffe v. Life Ins. Co. of N. Am., 769 F. Supp. 2d 530, 543-544 (S.D.N.Y. 2011). As reflected in plaintiffs' attached contemporaneous time records, the 35.4 total hours of work includes mostly time spent on legal research and drafting initial and reply memoranda and other related motion papers.[21] (See Ex. B to Groarke Decl.). Plaintiffs' submissions were thorough and comprehensive, and we have no doubt that "a reasonable attorney would have expended similar hours in pursuit of the case." Balestriere, 2014 WL 7404068, at *4; see also Grant v. Martinez, 973 F.2d 96, 99 (2d Cir. 1992); Miroglio S.P.A. v. Conway Stores, Inc., 629 F. Supp. 2d 307, 312 (S.D.N.Y. 2009).

Second, we also easily find the hourly rates used by plaintiffs to calculate their fees to be reasonable. Generally, to determine an appropriate hourly rate, the court looks to rates prevailing in the community "for similar services by lawyers of

---

[21] Due to defendants' partial production of documents during the course of briefing on the motion, see supra p. 16, there were supplementary filings made subsequent to plaintiffs' first set of reply papers.

reasonably comparable skill, experience and reputation." <u>Blum v. Stenson</u>, 465 U.S. 886, 895 n.11 (1984); <u>McDonald v. Pension Plan of the NYSA-ILA Pension Trust Fund</u>, 450 F.3d 91, 96 (2d Cir. 2006); <u>Balestriere</u>, 2014 WL 7404068, at *4. Indeed, the rates quoted above -- of $150.00 and $200.00 for the two attorneys and $140.00 for the two law clerks and paralegal (<u>see</u> Groarke Decl. at ¶¶ 11-12) -- are well within what is reasonable for individuals with their respective levels of experience working on ERISA litigation. <u>See</u>, e.g., <u>Trs. of New York City Dist. Council of Carpenters Pension Fund v. Mountaintop Cabinet Mfr. Corp.</u>, 2012 WL 3756279, *5 (Aug. 29, 2012) (citing cases describing reasonable rates of attorneys and legal assistants for ERISA work).

The fees sought are therefore presumptively reasonable, and we can find no reason to depart from this presumption. We therefore recommend that plaintiffs be awarded the $5,264.00 sought.

## CONCLUSION

For the reasons noted, we recommend that plaintiffs' motion be granted to the extent that we have described.

73

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Laura T. Swain, Room 1320, 500 Pearl Street, New York, New York 10007-1312. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(d); Thomas v. Arn, 474 U.S. 140, 150 (1985); DeLeon v. Strack, 234 F.3d 84, 86 (2d. Cir. 2000) (citing Small v. Sec'y. of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989)).

**Dated:**      **New York, New York**
          **January 21, 2015**

**MICHAEL H. DOLINGER**
**UNITED STATES MAGISTRATE JUDGE**

74

Copies of the foregoing Report & Recommendation have been mailed today to:

**Alicia Margaret Shotwell, Esq.**
Colleran, O'hara & Mills LLP
100 Crossways Park Drive West
Suite 200
Woodbury, NY 11797

**John Stackpole Groarke, Esq.**
**Robin Young Tyrrell, Esq.**
Colleran, O'hara & Mills LLP
1225 Franklin Avenue, Suite 450
Garden City, NY 11530

**George Christopoulos, Esq.**
Dreifuss Bonacci & Parker, LLP
26 Columbia Turnpike, North Entrance
Florham Park, NJ 07932